UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:08-CV-412-KSF

JERRY SANDER                                                              PLAINTIFF

vs.                          **OPINION AND ORDER**

GRAY TELEVISION GROUP, INC., et al.                              DEFENDANTS

* * * * * * * *

This matter is before the Court on the motion of Defendant Gray Television Group ("Gray")
for summary judgment on all of Plaintiff's claims and on Plaintiff's motion to strike the Kentucky
Unemployment Insurance Commission's Order attached as Exhibit 12 to Defendant's
Memorandum. For the reasons stated below, Plaintiff's motion to strike will be granted, and
Defendant's motion for summary judgment will be granted.

I.     **BACKGROUND**

Plaintiff's First Amended Complaint alleges age discrimination under the Age Discrimination
in Employment Act (ADEA) and the Kentucky Civil Rights Act (KCRA); breach of employment
contract; retaliation; and wrongful discharge. [DE 34]. Gray moved for summary judgment on all
claims, arguing that Sander failed to establish a *prima facie* case of age discrimination or
retaliation; that there was no evidence of breach of the employment agreement; that Sander
voluntarily "quit" his position under circumstances that do not constitute constructive discharge or
wrongful termination; and that there was no factual or legal basis for the demand for punitive
damages. [DE 52].

Plaintiff Jerry Sander (Sander) began working as a news reporter at WKYT-TV in 1981 and
continued until February 21, 2008. [Statement of Undisputed Facts (Statement) DE 52-2 ¶¶ 1, 7].

Sander became an employee of Gray in 1993 or 1994 when Gray bought WKYT. [*Id.* at ¶ 1]. In December 2004, Sander signed an eight-year Employee/Employer Agreement (Agreement) offered to him by the News Director at the time, Jim Ogle. *Id.* at ¶ 2; DE 57-7 Response to Statement (Response) ¶ 2]. Ogle also gave Sander the title Senior Reporter because they had "hired some very young, inexperienced reporters" that Ogle thought needed more day-to-day supervision. Ogle was not as "hands on" in the newsroom as other news directors. [Martin Depo. at 48-49].

The Agreement provided in part:

2.   <u>DUTIES OF EMPLOYEE:</u> During the term of this Agreement, the Employee shall:

    (A)   Promptly and in good faith comply with all directions, requests, requirements, rules and regulations made by Employer in the conduct of its business.

    (B)   Fulfill the duties of Senior Reporter and perform such services as Employer, in its exclusive discretion shall designate with respect to broadcasts produced by Employer.... Employer reserves the right to alter Employee's duties, as it deems appropriate.

10.   <u>TERMINATION:</u> Employer may terminate Employee and all of its obligations set forth in this Agreement prior to the scheduled completion of its term as follows:

    1.   <u>TERMINATION FOR CAUSE:</u> Employer can terminate this Agreement, (or suspend Employee without pay at Employer's option) if Employee:

        (2)   Fails to perform any of his obligations set forth herein, or which are natural incidence to performance of his duties or employment responsibilities, by willful default, neglect or misconduct;

        (3)   Fails to comply with any of the rules and policies established by Employer;

        (4)   Fails to comply with any of the terms of this Agreement.

[DE 53-1, Attachment B].

In August 2006, Robert Thomas was hired as the News Director and Sander's immediate supervisor. [Statement ¶ 5]. Thomas "wanted to emphasize breaking news." [Bryant Depo. at 36]. Thomas had a plan to throw all the resources he could at breaking news. [Trease Depo. at 10]. Thomas also valued the importance of the morning news and brought a new emphasis and added

resources to it. [Martin at 105]. Wayne Martin, General Manager of the station, saw this change as an "opportunity" that they "seized." [*Id.* at 106-107]. Thomas' philosophy of running a newsroom was also quite different; he wanted to "be directly involved on a daily basis with reporters." [*Id.* at 63]. With Martin's approval, Thomas removed "Senior" from Sander's title. [*Id.* at 62]. In January 2008, Sander complained to Martin about the way Thomas was running the news department and that "he thought Thomas had too much of a bias toward leading with news stories involving some sort of tragedy." [Martin at 42-43].

On Wednesday, February 20, 2008 news reporters were told that, starting the following Monday, "they would be required to web produce their own stories" and they would receive refresher training beginning the next day. [Sander I at 148; Amended Complaint p. 3]. That next day, February 21, 2008, a winter storm was approaching, which was a big story, and Sander "wanted a piece of that story." [*Id.* at 155]. He was told at 8:15 a.m. that morning to report for the computer training for putting stories on the web. [*Id.* at 109, 150].

Following the computer training, fifteen newsroom employees met at 9:30 a.m. for their daily meeting and assignments. [Statement and Response ¶ 7; Hill Depo. at 28-29]. Just before the meeting started, Thomas told Sander he would be producing stories on the web for the day. [Sander I at 153]. Sander understood this to mean that he would be web producing *all* of the WKYT news stories for the day. [Complaint, p. 3]. Sander asked if he was being punished and was told no. [Sander I at 155]. Sander believed he could "muddle through" the assignment, which he did not think was time sensitive. [*Id.* at 155-56]. During the meeting, Michelle Hill, the Executive Producer, said that Sander could help with "SnoGo" involving updates of school and business closings. [*Id.* at 159]. That is what "set [Sander] off." [*Id.*]. He said he can't do SnoGo and would not know how to start. [*Id.* at 159-160]. Sander said, "I don't know how to do it, I can't do it and I won't do it." [*Id.* at 160]. In response, Thomas yelled, "don't you ever tell me what you will or will not do" or something to that effect. [*Id.* at 162].

Sander responded by telling Thomas that he was not feeling well and was going home. Thomas told him to "go home and don't come back until we tell you to." Sander asked permission to see Wayne Martin, Thomas' boss. [*Id.* at 162-166]. Sander went directly to Martin's office and was told by Martin's assistant, Deanna Wolfe, that Martin was out of town Thursday and Friday. [*Id.* at 167]. Sander looked for Mike Kanarek, the Vice President of Operations, but could not find him. [*Id.* at 168; Martin at 21]. Sander then told Wolfe, "I can't take this anymore, I'm going to quit." [Sander I at 169]. As he returned to the news department to retrieve his jacket, he dropped or threw down his legal pad and the computer instructions at the end of the lobby. [*Id.* at 172-3]. Sander said to Thomas, "I guess now you have the money that you have been trying to get for so long," referring to his salary. [*Id.* at 174]. While leaving, Sander ran into master control operator Billy Hall and told Hall that he was "going to quit." [*Id.* at 175].

Sander's wife Karen came home from work and called Ms. Wolfe shortly to say her husband was very upset and did not mean to say he was quitting. [*Id.* at 179, 181]. Karen Sander attempted to call Human Resources, but learned they are in Georgia. [*Id.* at 183]. Sander asked her to call the assignment editor to see if he was to report to work and learned that Sander had been taken off the schedule. [*Id.* at 184]. That afternoon, Thomas called, but Jerry Sander became agitated, and Karen Sander suggested they talk at another time. [Karen Sander Depo. at 24]. She also told Thomas that Sander did not quit his job. *Id.* At some point, Martin returned Sander's calls and scheduled a meeting with Sander and Thomas for Monday at 10:00 a.m. [Martin at 70; Thomas at 142].

At the Monday, February 25, 2008 meeting, Sander read to Martin and Thomas a four-page prepared statement without interruption. [Sander I at 194, 196; Sander II, Exhibit I; DE 52-2, Exhibit A]. He admitted telling "[his] supervisor [he] would not do something" and explained that "the task was above me." [Exhibit A, p. 1]. Sander said he wanted to work at WKYT, but felt that Thomas wanted him to leave. Sander said he had documentation of a plan to rid the station of

several key people in the newsroom; there was a hostile work environment; and there had been a constructive termination. [*Id*. at 3]. Sander said, "there must be some stipulations" as to the way he would be treated in the future. [*Id.* at 4].

The meeting ended soon thereafter with Martin saying he had "four options: Accept [Sander's] resignation with no severance; terminate him for cause; accept his resignation with severance, or accept his request to return to work." [Martin at 70]. Martin wanted to evaluate what had occurred and said he would get back with Sander. [*Id.*] Sander interpreted Martin's comment about options to mean that Sander had four choices, so he told Martin he would really like to return to work. [Sander I at 199]. Sander felt he was in trouble, however, because Martin did not write notes on a pad as he usually did during a meeting. [*Id.* at 198-99]. After gathering additional information, Martin decided he would not take Sander back as an employee and told Sander his decision later in the week. [Martin at 69; Sander II at 30]. Martin advised he decided to accept Sander's resignation and would "offer him a severance with a condition of a signed release." [Martin at 69]. Sander did not accept that offer.

Martin testified that he had grounds to terminate Sander for cause after Sander refused "to accept a rather routine assignment" in an open meeting among his peers. [Martin at 78-79]. Sander admitted that he refused to handle SnoGo. [Sander I at 160]. Michelle Hill testified that SnoGo was a "station wide responsibility" and involved simply answering the phone and recording on a paper form what was closed, where, when and circling appropriate items on the form. [Hill at 31-32]. Martin did not terminate Sander for cause "[b]ecause he had resigned. He told at least three people he had resigned. And, frankly, I thought his years of service were worth me considering him having severance." [Martin at 78]. Martin ultimately concluded that allowing Sander to return to work after he refused a routine assignment and quit "would very much undermine the management of the news room and set a precedent." [*Id.* at 113].

Additional facts in support of Sander's claims and Gray's response are considered in the analysis below.

## II.    ANALYSIS OF OBJECTION TO COMMISSION ORDER AND MOTION TO STRIKE

In support of its motion for summary judgment, Gray relied on the Kentucky Unemployment Insurance Commission's ("Commission") Order denying unemployment benefits, because it concluded that Sander "voluntarily left the employment without good cause attributable to the employment." [DE 53-12, p. 4].  Sander responded to the motion for summary judgment that such evidence was not appropriate and should be stricken. [DE 57, p. 13, n. 2].  Sander also filed a separate motion to strike. [DE 56].  Gray responded with a procedural claim that a motion to strike is not appropriate.  It further argued that Sander's authority is distinguishable because those courts were asked to give the Commission's findings preclusive effect, whereas Gray simply wants the Court to consider it as a factor. [DE 73].

In *Board of Education of Covington v. Gray*, 806 S.W.2d 400 (Ky. Ct. App. 1991), the court considered the scope of a Kentucky Unemployment Commission decision and said:

> Kentucky's unemployment compensation system is set up to expeditiously award temporary, monetary benefits to a worker after loss of his or her job.  In order to receive such benefits, the worker must prove (or the employer, conversely, disprove) that he or she was involuntarily separated from employment without good cause on the employer's part.  KRS 341.370.  *The system's sole function is to determine whether or not the affected employee meets the statutory criteria to qualify for benefits, not to inquire or make any judgments regarding the reasons behind an employee's termination.*

*Id.* at 402, emphasis added.  The court further noted that the procedures in the unemployment system do not "grant any party a full, true opportunity to litigate issues, or even encourage any meaningful participation in the process." *Id.* at 403.  Moreover, employers are not motivated by the small amounts and narrow issues involved to appear at the hearing or appeal adverse issues.  *Id.* If such findings could be used to establish an employer's liability in other proceedings, the court cautioned that employers would contest issues vigorously and place an untenable burden on the unemployment system.  *Id.  See also Jones v. Metal Management Nashville LLC*, 2009 WL 197427

(W.D. Ky. 2009) ("An unemployment compensation hearing is designed to adjudicate promptly a narrow issue of law, and to grant a limited remedy to an unemployed worker. It is not designed to bind the parties in a subsequent action."); KRS 341.420(5) ("No finding of fact or law, judgment, conclusion, or final order made with respect to a claim for unemployment compensation ... may be conclusive or binding in any separate or subsequent action or proceeding in another forum...."). While Defendant claims it is not seeking any preclusive effect in the present case, it must be urging some significance be given to the decision or there would be no relevance.

Another substantial reason for striking or disregarding the Commissioner's Order is that it is not proper evidence under Fed. R. Civ. P. 56. Unsworn statements "may not be considered on a motion for summary judgment." *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006). In *Pack*, the court held that an unsworn expert report could not be considered. In *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363 (6th Cir. 2001), the district court correctly disregarded an unsworn letter from an employee. In *Sigler v. American Honda Motor Co.*, 532 F.3d 469 (6th Cir. 2008), the court held that "the district court improperly considered Honda's unsworn, hearsay evidence in deciding to grant Honda's motion for summary judgment." *Id.* at 481.

Plaintiff properly raised an objection to the Commissioner's Order by arguing against the evidence in its response to summary judgment and by filing a motion to strike. For the reasons noted above, the motion to strike will be granted.

## II.     ANALYSIS OF MOTION FOR SUMMARY JUDGMENT

Summary judgment should be granted when the moving party can "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

### A.   Age Discrimination Claim Under the ADEA and KCRA

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...." 29 U.S.C. § 623(a)(1). A violation may be established by either direct or circumstantial evidence. *Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 410 (6th Cir. 2008). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003) *(en banc)* (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* The Supreme Court recently clarified that with either form of evidence, "the burden of persuasion remains on ADEA plaintiffs to demonstrate 'that age was the "but-for" cause of their employer's adverse action.'" *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009), quoting *Gross v. FBL Financial Services, Inc.*, ___ U.S. ___, 129 S.Ct., 2343, 2351 (2009). Claims alleging age discrimination

under the Kentucky Civil Rights Act (KCRA) are analyzed in the same manner as ADEA claims. *Allen v. Highlands Hosp. Corp*., 545 F.3d 387, 393 (6th Cir. 2008).

        1.    <u>Circumstantial Evidence</u>

Sander does not claim to have direct evidence that age was the "but for" reason he is no longer at WKYT. Instead, he relies on the following circumstantial evidence. "Without warning, Thomas removed Sander's responsibilities as a Senior Reporter." "[O]n several occasions Thomas asked Sander about his intentions for completing his contract through 2012." "Thomas also called Sander 'old-school,' 'old-fashioned' and 'old' on numerous occasions." "Michelle Hill, the Executive Producer, made similar comments about Sander when discussing his story ideas." A news anchor "believed Hill thought Sander was 'out of step,' 'boring,' and 'old-fashioned.'" During two elections after Thomas became his boss, Sander no longer was assigned live reporting from major campaign headquarters. [DE 57, p. 4]. Instead, those assignments went to younger reporters. *Id.* at 5. In October 2007, Sander was moved from the day shift to the morning shift and back to the day shift within three months. *Id.* Sander claims he was ordered "to perform new tasks, for which he did not have experience or training," specifically web producing and SnoGo. When Sander said he could not handle SnoGo, Thomas yelled at him, causing Sander to feel ill. When Sander said he had to leave, Thomas yelled again. *Id.* at 6. Sander suffered an unprecedented level of emotional distress and told Martin's assistant that he quit. Sander also told Hall he quit. *Id.* at 7. Sander claims, however, he could not unilaterally terminate his employment agreement without written, advance notice. [DE 57 at 14].

During the February 25 meeting, Sander complained that Thomas planned to get rid of old employees and that Thomas had constructively terminated him. [*Id.* at 8; Sander II, Exhibit 1, and p. 24]. Around 5:00 p.m. that evening, Martin emailed to Gray a spreadsheet of additional expense reductions that included Sander's name and salary. [DE 53-1, Exhibit C]. On Friday, February 29, Martin advised Sander of his decision to accept Sander's resignation. [Martin at 113].

Sander testified that he "was, on a number of occasions, publicly ridiculed for being 'old-fashioned,' 'old school,' 'old,'" by Thomas and Hill. However, he could never identify the number of times such comments were made, any dates, any circumstances, anyone else who was present, anyone who heard them or any context at all except to claim that Ms. Hill criticized his way of putting stories together as "old school." [Sander I at 35, 46-47, 52-53]. Sander admitted that no one else made any comment to him about being old-fashioned or old school. [*Id.* at 51]. There is no evidence that anyone heard such comments. Bryant said he thought Thomas had "a feeling that Jerry's delivery and appearance at times were dated," but Bryant's comment was in the context that Sander would not wear a tie after being told to do so. [Bryant at 73].

"Statements by nondecisionmakers, or statements unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden ... of demonstrating animus." *Geiger*, 579 F.3d at 621, quoting *Bush v. Dictaphone Corp*, 161 F.3d 363, 369 (6th Cir. 1998) (alterations in original). Martin was the decision maker regarding Sander's status. Hill was not in the chain of command.

Sander also never complained to anyone about the alleged comments or age discrimination. [*Id.* at 52-53]. He did not even mention it to his wife until she told him she thought he was being discriminated against. [Karen Sander at 29]. Instead, it was Sander who referred to himself as "senior (old) reporter" in an email to Thomas, who asked photographers to "help an old man out'" and who referenced himself as an "old man" in an email to a fan. [*Id.* at 54, 58-60]. Absent supporting evidence, Sander's age discrimination claims are merely conclusory allegations. Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Moore v. Phillip Morris Companies, Inc.* 8 F.3d 335, 340(6th Cir. 1993). "Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination." *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986).

Sander also failed to support his claim that there was a plan to get rid of old employees. On February 25, 2008, Sander read to Martin and Thomas from his prepared statement as follows:

> I have recently come into possession of documented information of a plan to rid WKYT not only of myself but also several other key people in the newsroom. I will not mention their names or the names of my sources. However, it has come to light that discussions within "so called news management meetings" included detailed and elaborate talk of how to accomplish these goals. From the evidence, the plan appears to be money, personality, and age/appearance based.

[Sander I at 194, 196; DE 52-2, Exhibit A]. During his deposition, however, Sander could not "remember where the documented information came from," whether it was actually written or merely verbal, who may have provided such information, or even what the information was. [Sander II at 7-10, 12, 15]. He simply said he was told by someone that there was a plan based on money, personality, and age/appearance, but he could not remember anything else about it, including who told him. [*Id.* at 17]. This conclusory allegation also is insufficient to support a claim of age discrimination.

Sander alleges that Thomas asked him "on several occasions ... about his intentions for completing his contract through 2012." [DE 57 at 4]. Sander also claims that Thomas asked "frequent questions regarding Sander's retirement intentions." [*Id.*]. In his deposition, Sander admitted that Thomas only asked him about his intent to work out the years on his contract "[t]wo or three" times. [Sander I at 36-37]. Once again, Sander could not remember any details about the circumstances, the locations, or whether others were present when these alleged comments were made. [*Id.* at 37]. He admitted telling Thomas that he might stop working when he was 65, which would be before the end of his contract. [*Id.*]. At the time Sander was negotiating his contract in 2004, he brought up to Martin and Ogle that "this would likely be [his] last contract." [*Id.* at 44]. Martin testified that Sander "on numerous occasions told [Martin] he did not know if he would fulfill the length of his contract." [Martin at 130-31]. It never crossed Sander's mind that Thomas might be trying to plan for the future and future hiring. [Sander I at 38-39]. Instead, Sander felt the retirement questions and comments about old school or old fashioned were a "signal that Mr. Thomas would rather not have me in his department under his supervision." [*Id.* at 38].

Sander claims that Thomas removed him from election night and health coverage. [DE 57 at 4]. Sander testified that in November 2006, he "was relegated to picking up quick tape pieces on very local races rather than being showcased, which I normally was, with a major candidate." [Sander I at 88-89]. In November 2007, Sander had been moved to the morning shift and was not assigned any election coverage. [Martin at 60]. Martin testified that having Sander do election coverage and the morning shift anchor "would have been an unreasonable request of him." [*Id.* at 60-61]. Instead, election coverage was provided by other anchors. [DE 57 at 5]. Additionally, Sander's health reporter beat was cut by Ogle "some years earlier" before Thomas arrived, and Sander was moved to general assignment. [Bryant at 54-55]. Thomas simply decided that "health and medicine could be covered by what we could do from the general assignment pool and feeds that we got from networks," which was not a drastic change. [Bryant at 54-55].

### 2. *McDonnell-Douglas* Analysis

The Sixth Circuit analyzes the circumstantial evidence of ADEA claims under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009) ("The *McDonnell Douglas* test thus remains applicable law in this circuit..."). To set forth a *prima facie* case of age discrimination, a plaintiff must establish four elements: 1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class. *Id.*

In support of its motion for summary judgment, Gray argues that Sander cannot establish a *prima facie* case of discrimination because he cannot satisfy the second and fourth elements. Gray claims Sander was not discharged, nor was there any adverse employment action, because he voluntarily quit his position at WKYT.[1] Gray also contends there is no proof that Sander was replaced by someone outside of the protected class.

---

[1] Sander's claim of constructive discharge is addressed separately below.

Sander does not deny telling Martin's assistant, Deanna Wolfe, and Billy Hall that he quit before he left for home. [Sander I at 107, 116, 169, 175, 178]. Instead, he offers various excuses for his statements. First, he argues he did not tell anyone who had authority to accept his resignation, and he had no one in management with whom to confer. [DE 57 at 13]. Sander could certainly have conferred with his direct supervisor, Thomas. Instead, he told the assistant to the general manager he was quitting and left. Sander had no reason to think she would keep this information a secret. He also told Thomas that Thomas now had the money (Sander's salary) that he had been trying to get for so long. [Sander I at 174]. Sander's voluntary resignation was clear. The fact that Sander and his wife tried to unring that bell and ask for his job back later in the day cannot change the fact that Sander voluntarily quit and walked out of WKYT that morning.

Sander attempts to excuse his conduct by saying that he was suffering "extreme emotional distress." [DE 57 at 13]. An employee is not entitled to walk out on a job merely because he cannot control his temper. Moreover, Sander showed no remorse for his conduct when he met with Martin and Thomas to discuss the situation the following Monday. [DE 52-2; Thomas at 142]. Rather, he demanded "stipulations" before he would return to work. [DE 52-2 at 3].

Sander argues a jury could conclude that Gray "had a motive for exaggerating Sander's voiced frustrations and fabricating a 'quit' out of his actions." [DE 57 at 13]. In support, Sander relies on the budget constraints facing the station and on the fact that he was the highest paid reporter. This excuse ignores the fact that Sander refused an assignment and admitted telling two people he quit. Gray may have acknowledged reality after the Monday meeting, but there was no fabrication.

Finally, Sander argues he could not unilaterally terminate his contract without written notice. However, that is exactly what he did do. He left work and went home. Additionally, the Agreement does not require written notice of all terminations. Paragraph 15 merely says "notices or communications permitted or required by this Agreement shall be in writing." Even if there were

an obligation to provide a writing, the failure to do so would not render a resignation void.  Instead, it would give the employer a breach of contract claim.  The employee handbook on which Sander also relies for a requirement of written notice provides only that "[f]ailure to provide ... written notice ... will disqualify any terminating employee for the payment of unused vacation time." [DE 57, Exhibit 4].  The resignation remains valid.

Sander also failed to meet his burden of presenting evidence that "but for" his age, he would not have lost his job.  He does not point to any "similarly situated" younger employee who received more favorable treatment or any other evidence that he was singled out for impermissible reasons. He certainly cannot identify another employee, regardless of age, who refused an assignment in an open meeting, went home and was later allowed to return to work.  It is not necessary to consider whether Sander was replaced by a younger person in light of his failure to demonstrate an adverse employment action based on age.

Even if Sander had presented a *prima facie* case, Gray articulated a legitimate, non-discriminatory reason for its decision.  Accordingly, Sander had the burden to present material issues of fact demonstrating that Gray's stated reasons are pretextual.  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

Sander's employment agreement required him to "[p]romptly and in good faith comply with all directions, requests, requirements, rules and regulations made by Employer in the conduct of its business."  He also was required to "perform such services as Employer, in its exclusive discretion, shall designate...." [DE 53-1, Attachment B, ¶¶ 2.(A), (B)].  Sander admits he refused the assignment of SnoGo and told two or three people he was quitting before he left for home.  He knew when he got home that he was in trouble, so he tried to take it back through calls to the station and to Martin.  He knew he was in trouble during the meeting with Martin and Thomas, but

he showed no remorse and made demands instead. Gray's reason for not allowing Sander to take back his resignation is solidly based on fact.

Sander also has failed to present any evidence of younger employees being permitted to work after engaging in nearly identical conduct. *See* DE 57, pp. 20-26. In fact, the evidence showed that another older employee who disagreed with an assignment from Thomas, performed it anyway to the best of his ability and then calmly discussed his concerns with Thomas later. [Trease at 31-34]. Thomas testified that no one else during his tenure refused to do any particular assignment. [Thomas at 160].

This leaves Sander with the obligation of proving that his words and actions on February 21 and 25, 2008, did not actually motivate Martin's decision to accept his resignation and that "but for" his age, he would have been allowed to return. Sander relies on decisions by Thomas to move Trease to a weekend anchor position and to move Sander to a morning anchor and then move Sander back to days. [DE 57 at 22]. Sander's speculation that these decisions were motivated by age is belied by the fact that Thomas later moved Bryant and Bailey to the morning anchor slots and saw the morning audience "triple." [Bryant at 31]. By contrast, ratings declined while Sander was the morning anchor, resulting in his being moved back to the day shift. [Martin at 109; Thomas at 78-79]. Additionally, younger reporters have been reassigned to different shifts and to anchor positions. [Thomas at 98-99]. The reassignments do not support Sander's age discrimination claims.

Sander also argues that Thomas assigned him tasks he was not qualified to perform and, therefore, his refusal to perform them could not provide "a basis for [his] termination." [DE 57 at 24]. First, Sander was not terminated; he quit. Second, Sander was trained on web producing stories the very morning of the assignment and on an earlier occasion. Every reporter received a memorandum that they were to start producing stories on the web the following Monday. [Sander I at 148-49]. Sander had previously told Thomas that posting stories on the web "was too much

workload." [Thomas at 172]. Thomas asked Sander to post stories on February 21 "to use the new skills he had just learned in a training session and get better at posting stories by using that day as an opportunity to use those skills. So he could get even better at it and be more efficient at it." [*Id.*].

To further support his pretext claim, Sander says, "Thomas admitted that he harbored an age-related bias against Sander, perceiving him as lacking in energy and reluctant to change. (Thomas Dep. at 172-173)." [DE 57 at 25]. Thomas' description of Sander's energy level on the air as "weak" is not an age-related bias at all, much less an admission of one. Thomas said "energy level" could be judged by:

> how engaging they are in what they're telling you on the air. How they draw you in as a viewer. How passionate do they sound about the story that they're telling on the air. You know, how aggressive are they out in the field in getting information, and getting interviews that other stations don't get.

[Thomas at 174]. Thomas was simply disappointed in Sander's level of enthusiasm on the air. Enthusiasm, or the lack thereof, can be caused by many things that bear no relationship at all to age. Sander also cites the fact that Thomas described another older reporter as lacking in energy compared to a co-anchor. In that case, Thomas said:

> It didn't match the co-anchor. Like ... you're also trying to build a team on the air the viewers see, and the fact that, you know, she's very energetic and she's very dynamic on the air, and  – and I felt that – that they weren't a strong match as far as energy level.

[Thomas at 38]. Regarding how an anchor shows energy on the air, Thomas said:

> In ... their delivery and how they read and ... how they convey information to you as a viewer, because, I mean, they need to be speaking to you. I mean, they don't need to be seen as like I'm reading something off of a teleprompter to you. It's, you know, you're looking for somebody that can create that conversation with a viewer. ... It's more than just, you know, read these ten stories on a piece of paper and like look at the prompter. I mean, it's also there are moments where, like, their personality is to shine through.

[*Id.* at 39]. Once again, the discussion is about enthusiasm, not age. The defendant is a television station, and it is entitled to have enthusiastic anchors – such as Betty White, for example.

Sander relies on *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003), which he says involved similar discriminatory comments, and he notes that the court said such "comments permitted an inference that the decision makers adhered to stereotypes about older employees." [DE 57 at 26]. There are important distinctions between *Wexler* and the present case. The *Wexler* analysis involved the less stringent "mixed-motive" standard, *Wexler*, 317 F.3d at 571, which the Supreme Court expressly rejected in *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2348 (2009). Additionally, Wexler provided evidence of comments by his boss that were unquestionably age related – "you're 60 years old, aren't you, Don? ... You don't need the aggravation, stress of management problems...."; "you're getting older, although not as old as I am"; "a bearded, grumpy old man"; "pops"; and "old man." *Wexler*, 317 F.3d at 570-71.

The evidence provided by Sander falls far short of that mark. Instead, the comments reflect a lack of enthusiasm on the air, an unwillingness to keep pace with changing times, and a concern that Sander might retire before the end of his contract. Sander has not met his burden to show that the stated reason for Sander's status was pretextual and that "but for" his age, he would have been allowed to take back his resignation.

### 3. Constructive Discharge

While Sander voluntarily quit, he may establish an adverse employment action by showing that he was constructively discharged. "To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) 'the employer ... deliberately created intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit....'" *Logan v. Denny's Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.,* 171 F.3d 1073, 1080 (6th Cir. 1999)). "When an employee alleges that he was forced to resign, the employee's perception must be judged objectively without consideration of his undue sensitivities. The employee has an obligation not to assume the worst and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515

(6th Cir. 1991) (internal citations and quotations omitted). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004) (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)).

In support of almost all of his claims, Sander relies on his allegations that Thomas eliminated his senior reporter status; called him "old-school," "old-fashioned," or "old"; removed him from election night and health coverage; reassigned him to three different shifts in three months; ordered him to perform new tasks for which he did not have training; and yelled at him on February 21, 2008, to go home and not return until told to do so. [DE 57 at 4-8]. The flaws and lack of objective support for most of these factual allegations were noted above.

Sander has shown that he was dissatisfied with his work assignments, felt he was not appreciated as much as he should be, and resented being assigned tasks associated with the web. *See Smith*, 376 F.3d at 534. He has not created an issue of fact, however, as to whether WKYT "deliberately created intolerable working conditions as perceived by a reasonable person," much less that it did so "with the intention of forcing the employee to quit." *Logan*, 259 F.3d at 568. Certainly, he has not shown he was demoted, suffered a reduction in salary, assigned to menial or degrading work, reassigned under a younger supervisor, suffered badgering harassment or humiliation calculated to encourage his resignation, or offered early retirement or continued employment on less favorable terms. *Id.* at 259. With respect to the objective reasonableness of Sander's perception, the record reflects that Thomas supervised other older reporters whom Sander claims were also targeted on the basis of age, but there is no evidence that anyone else found the conditions so intolerable that they were forced to resign. Sander's perception of his employer's conduct is not objectively reasonable. He has failed to produce evidence of constructive discharge.

**B.      Retaliation Claim Under the KCRA or In Violation of Kentucky Public Policy**[2]

Sander's retaliation claim is based on his complaint to Martin in the February 25, 2008 meeting that there was a plan to get rid of employees based on age and that Thomas "was trying to constructively discharge him by forcing him to perform tasks that Sander was not qualified to do to try to get him to quit." [DE 57 at 8-9].   Sander argues that promptly thereafter, his employment was terminated in retaliation for this protected activity.   Sander admitted talking with his daughter, who is a lawyer, the weekend before the Monday meeting and that she explained "constructive discharge" to him. [Sander II at 18-19].   This discussion was in connection with his departure from WKYT. [*Id*. at 24].   Sander began the February 25 meeting by saying he had consulted with legal counsel and had a prepared statement that he would like to read.    [Martin at 94-95].

In support of his retaliation claim, Sander argues that, before the meeting, Thomas and Martin considered allowing him to return to work. [*Id*. at 17].   Although the decision was to be made by Martin, Thomas said he would have been willing for Sander to come back if "he had learned from this experience," meaning if "he came into that meeting and showed remorse for his behavior that day." [Thomas at 142].   Martin said it was his practice when someone had a complaint to bring their supervisor in to discuss it. [Martin at 70].   According to Sander, Martin told him at the end of the meeting "that he had to support his news director." [Sander at 198].   Following the meeting, Martin talked to those who attended the whole February 21 meeting, learned that reporters were made aware of their obligation to produce on the web and the training for it, and concluded that Sander refused to accept a routine assignment during an open meeting among his peers. [Martin at 79-80, 91-92].   Martin believed Sander could have been terminated for cause but did not terminate him because Sander had already resigned. [*Id*. at 78].

---

[2]  Plaintiff states in his Pretrial Brief that his wrongful discharge claim is actually a claim of retaliation in violation of Kentucky public policy. [DE 77 at 1].

Sander argues that the proximity between his allegation of age discrimination/ constructive discharge and the decision not to allow him to return to work are sufficient for a jury to find a causal connection for a retaliation claim. [DE 57 at 18]. It is clear, however, that "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Blackwell v. Product Action International, Inc.*. 2006 WL 3747519at *15 (E.D. Ky. 2006) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). The first flaw in Sander's retaliation claim is that he was not terminated or constructively discharged. There was no change in his employment status between February 21 when he quit and February 29 when Martin accepted his resignation. Sander never returned to work and was not treated differently by his employer as a result of his allegation of discrimination.

Second, as in *Blackwell*, the decision regarding Sander's employment is directly connected to his serious misconduct as an employee. [*Id.* at *16]. "To establish the causal connection required in the fourth prong [of a *prima facie* retaliation case], a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). No reasonable jury could infer that the decision to accept Sander's resignation was unrelated to his misconduct and would not have happened if he had not mentioned age discrimination in the meeting. It appears Sander was trying to save himself on February 25 by throwing about threats, but it simply did not work. Gray is entitled to summary judgment on Sander's retaliation claim.

### C.     Breach of Contract Claim

Gray seeks summary judgment on Sander's breach of contract claim on the ground that Sander failed to fully perform his duties under the employment agreement and, further that Gray would have had cause to terminate his employment. [DE 52 at 24-25]. Gray notes that Sander was required to "[p]romptly and in good faith comply with all directions, requests, requirements, rules

and regulations made by Employer in the conduct of its business" and to "perform such services as Employer, in its exclusive discretion, shall designate ...." [DE 53-1. Attachment B].

Sander admits that he refused to assist with SnoGo responsibilities. He made no effort to try to do the assignment. [Sander I at 95-96]. Instead, he said "I can't do it and I won't do it." [*Id.* at 160]. Then he left work, saying that he quit. Sander was obligated to comply with Thomas' assignments under the Agreement. It is Sander who breached the Agreement. He cannot prevail on a breach of contract claim when he failed to perform his duties under the Agreement. A party who breaches a contract cannot claim any rights or advantage under the contract to the detriment of the nonbreaching party. *Allen v. Cummings*, 500 S.W.2d 795, 798 (Ky. 1973). For Sander to claim that Gray breached the Agreement when it refused to allow him to return to work turns the breach of contract issue on its head.

Sander argues that the Agreement did not obligate him to work on SnoGo because "SnoGo is not a broadcast" and the assignment was not reasonable or "within his qualifications." [DE 57 at 11-12]. "It is well settled that the interpretation of contracts is an issue of law for the court to decide." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). The language of this contract is not ambiguous. Under Paragraph 2(A), Sander was required to "[p]romptly and in good faith comply with *all* directions, requests, requirements, rules and regulations made by Employer in the conduct of its business." [DE 53-1, Attachment B, emphasis added]. It does not say Sander only needed to comply with requirements he believed were "reasonable" or "within his qualifications." Likewise, Sander's interpretation that SnoGo is not a "broadcast" is without merit. Hill testified that SnoGo information is broadcast "if need be, in a crawl system on the bottom of the TV screen." [Hill at 30].

In light of the compelling evidence that Sander voluntarily quit his job and otherwise breached his contract, it is not necessary to burden this Opinion further with a discussion of the grounds Gray had to terminate Sander for cause.

III.    **CONCLUSION**

**IT IS ORDERED** that:

1.      Plaintiff's motion to strike the Kentucky Unemployment Insurance Commission's Order [DE 56] is **GRANTED**;

2.      Gray Television Groups' motion for summary judgment [DE 52] is **GRANTED**;

3.      Plaintiff's request for oral argument [DE 57] is **DENIED AS MOOT**;

4.      The pretrial conference and trial scheduled for September 30, 2010 and November 2, 2010, respectively, are **SET ASIDE**; and

5.      Judgment in favor of the Defendant on all of Plaintiff's claims shall be entered contemporaneously with this opinion.

This August 13, 2010.

**Signed By:**

_**Karl S. Forester**_  *K S F*

**United States Senior Judge**